**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GRACE MARVEL, Individually and as | : | |
| Executrix for the Estate of David Marvel, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DELAWARE COUNTY, | : | NO.  07-5054 |
| WALTER R. OMLOR, JR. and | : | |
| PAUL M. MICUN, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER S.J.                                                          June 2, 2009

   Currently pending before the Court is the Motion for Summary Judgment filed by

Defendants Delaware County, Walter R. Omlor, Jr., and Paul M. Micun (collectively

"Defendants").  For the following reasons, the Motion is granted.

**I.   FACTUAL BACKGROUND**[1]

   Plaintiff's decedent, David Marvel, was arrested, on May 10, 2006, by Ridley

Park Police in Delaware County, and charged with DUI and other related offenses.  (Defs.' Mot.

Summ. J., Ex. 1.)  In connection with this arrest, Marvel hired Eugene A. Bonner, Esquire to

represent him.  (Defs.' Mot. Summ. J., Ex. 2, Eugene Bonner Dep. ("Bonner Dep."), 10:14-25,

Nov. 4, 2008.)  Upon consultation with Bonner, Marvel opted to apply for Delaware County's

Accelerated Rehabilitative Disposition ("ARD") program, which is an alternative sentencing

---

[1]  The factual history is compiled from an examination of both parties' Statements of Facts and their accompanying exhibits.  To the extent a fact is disputed, the Court highlights the dispute by referencing each party's evidence.

program available, on a purely voluntary basis, to first-time offenders.  (Id. at 33:20-36:7; Defs.'

Mot. Summ. J., Ex. 3, Walter Omlor, Jr. Dep. ("Omlor Dep."), 159:12-160:5, Oct. 1, 2008.)  The

program allows a participant to have his or her record expunged, avoiding a criminal conviction.

(Id. at 159:17-160:5.)  The "fast track" portion of the ARD program occurs prior to the

preliminary hearing and formal acceptance into the ARD program.  Fast track allows applicants

to reduce both the suspension of their license and their community service hours by completing

their obligations within a set period of time.  (Bonner Dep. 35:10-18; Omlor Dep. 159:19-160:5;

Defs.' Mot. Summ. J., Ex. 5, Kathleen Supplee Dep. ("Supplee Dep."), 17:12-24, Jan. 14, 2009.)

Bonner explained to Marvel that his community service would involve some sort of manual

labor, usually like trash pick-up or raking leaves in the park.  (Bonner Dep. 33:25-34:9.)  Marvel

did not express any concerns to Bonner regarding his ability to do community service work, nor

did Bonner feel that it was his duty to inquire into Marvel's health problems.  (Id. at 18:26-19:5,

34:21-35:9.)

   At the time of his arrest, Marvel was fifty-nine years old.  (Defs.' Mot. Summ. J.,

Ex. 1.) For multiple years prior, Marvel had been treated for  high blood pressure by his family

physician, Dr. Woodrow Kessler.  (Defs.' Mot. Summ. J., Ex. 6, Woodrow Kessler, M.D. Dep.

("Dr. Kessler Dep."), 11:4-13, Dec. 18, 2008.)  During the summer of 2006, Marvel was taking

cardiac medication for his blood pressure, cholesterol medication, and a daily aspirin, but,

according to his wife, Grace, he never had any problems with his heart.  (Id. at 20:2-14, 77:3-18;

Pl's Opp. Mot. Summ. J., Ex. E, Grace Marvel Aff. ("G. Marvel Aff.") ¶ 5.)  Dr. Kessler noted

that Marvel had previously expressed concern about the fact that his father died from a heart

attack at age fifty-six, and that his two brothers developed coronary artery disease in their late

fifties, one of whom died.  (Dr. Kessler Dep. 55:22-57:24.)  Dr. Kessler also had a report from

Marvel's prior physician referencing a previous myocardial infarction.  (Id. at 28:7-30:14.)  Both

Grace Marvel stated and Plaintiff's expert cardiologist opined, however, that Marvel had never

had a myocardial infarction prior to performing community service.  (G. Marvel Aff. ¶ 6; Pl's.

Opp. Mot. Summ. J., Ex. I.)  Although Dr. Kessler had previously recommended an EKG to

verify the prior doctor's report, Marvel never went for the test.  (Dr. Kessler Dep.  31:11-37:5.)

Defendant Walter R. Omlor, Jr. has been the director of the Delaware County

Court-ordered Community Service Department since 1992.  (Omlor Dep. 16:7-17:9.)  Omlor

makes the decisions as to when community service operates and, as part of his job, checks the

weather daily to make arrangements for alternative work on days with extreme weather

conditions.  (Id. at 27:6-28:12.)  He testified that all community service workers are advised that

they are going to be doing manual labor, but that participation in the ARD program is totally

voluntary.  (Id. at 159:7-16.)  Further, as explained by Omlor's administrative assistant, Kathleen

Supplee, an individual in the Fast Track ARD program selects his or her own dates of service,

but must have it done within sixty days of their administrative hearing.  (Supplee Dep. 38:4-18.)

If an applicant were to advise the office that he had a medical concern, the office would have him

bring in medical documentation of his restrictions.[2]   (Id. at 37:4-38:3.)  Although all Fast Track

---

2.   In Plaintiff's Additional Statement of Undisputed Facts ("PASUF"), he alleges that Omlor testified that
community service workers were not free to refuse work, and that if they did so, they would be sent home and
penalized an additional eight hours of community service.  (PASUF ¶ 4 (citing Omlor Dep. 134).)  This Court's own
review of Omlor's testimony, however, reveals that he actually testified that a worker is free to refuse work on the
basis of a documented medical basis, but would be penalized for showing up and just saying they do not want to
work without any other reason.  (Omlor Dep. 133:6-16.)

In addition, both in the brief and at oral argument on May 20, 2009, Plaintiff's counsel cited to a
newspaper article wherein Omlor was quoted as saying that although there is alternative work for individuals with
medical conditions, such as indoor cleaning or stuffing envelopes, those individuals must establish those conditions
in court.  "[P]resenting a doctor's note on the work date will not guarantee special treatment. 'Once you show up

(continued...)

applicants must initially report to the Emergency Training Center, an applicant who does not

wish to do construction work may be given another assignment.  (Id. at 39:10-19.)  Moreover, if

a Fast Track applicant falls ill on the date of their community service work or advises the

supervisor that, due to illness or weather, they want to reschedule their service time, they are

allowed to do so without penalty.  (Id. at 40:4-42:14.)  Only where someone does not show up or

just decides, of their own volition, to leave their community service work, is there a penalty of

additional time imposed.[3]  (Id. at 41:21-42:14.)

In late July 2006, Marvel telephoned Omlor to schedule his community service

work.  (Omlor Dep. 53:9-54:7.)  Marvel indicated to Omlor that he was a crane-operator, but did

not give details about his job.  (Id. at 59:6-18.)  According to Plaintiff Grace Marvel, her husband

---

2. (...continued)

that's it.'" (Pl.'s Opp. Mot. Summ. J., Ex. BB; Transcript of Oral Argument, 15, May 20, 2009.)  Plaintiff argues that because Marvel was in Fast Track, he had no opportunity to go to court and present medical excuses prior to doing community service.

The Court finds several problems with this evidence.  First, it is pure hearsay and not capable of being reduced to a form admissible at trial.  As such, the Court may not consider it.  Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996).  More importantly, this statement, even taken as true, does not contradict Omlor's admissible statements.  In his deposition, Omlor explained that doctors' notes would be considered in requests for less strenuous assignments, but, consistent with the newspaper report, such assignments were not guaranteed.  Finally, Fast Track ARD is voluntary.  Had Marvel felt that he needed to attend a court hearing to demonstrate a medical condition, he could have opted out of the Fast Track portion of the ARD program.

3.   Plaintiff challenges this assertion, relying on the case of a man named Lawrence Malar.  Five months prior to Marvel's death, Malar, who was approximately Marvel's age, reported for community service with two doctor's notes, advising that, due to several medical conditions, his community service needed to be limited to non-strenuous activities.  (Pl's Statement of Undisputed Facts ("PSUF") ¶ 7 (citing Pl's Opp. Mot. Summ. J., Ex. C, Lawrence Malar Aff. ("Malar Aff."), ¶ 8).)  Nonetheless, when Malar appeared for service, he was not told he could do light duty indoor work and, instead, was required to perform strenuous work in extremely cold weather.  Id.  Ultimately, he ended up with pneumonia and exacerbation of his chronic obstructive pulmonary disease.  (Malar Aff. ¶¶ 9-11.)  Plaintiff now contends that these events prove that Marvel could not have escaped hard labor in the heat by producing a doctor's note.

The Court, however, finds that these events do not raise any question as to the facts as summarized.  As a primary matter, the Court has few details as to Mr. Malar's situation, such as the people with whom he spoke and whether he would have faced any penalty for refusing to perform his community service.  Moreover, what occurred with respect to Mr. Malar does not foretell what would have happened to Mr. Marvel had he produced a doctor's note indicating medical limitations.

had been employed for eighteen years at Mittal Steel in Conshohocken, Pennsylvania, where he

operated an air-conditioned crane and performed no outside work.  (G. Marvel Aff. ¶ 4.)  Omlor

did not ask about Plaintiff's physical abilities, and Marvel did not reveal that he had heart disease

or any other major medical condition.  (Omlor Dep. 162:17-163:4.)  According to Omlor, had

Marvel told him about some type of condition, he would have told Marvel to get a doctor's note

and come into the office.  (Id. at 163:5-11.)

Marvel opted to perform his community service on July 31, 2006, and August 1,

2006,[4] and Omlor told him to report promptly at 7:30 in the morning, drug and alcohol free,

dressed for the weather, wearing work gloves, and prepared to "do labor."  (Omlor Dep. 54:1-

56:7.)  Marvel arrived, as directed, to the Emergency Training Center on July 31, 2006, for his

first day of community service work.  (Compl. ¶ 12.)  The weather that day was extremely hot

and, in fact, the National Weather Service had issued an Excessive Heat Warning for Delaware

County from July 31, 2006 to August 3, 2006.  (Pl.'s Opp. Mot. Summ. J., Ex. J. 3.)  For both

July 31, 2006 and August 1, 2006, the heat index values reached up to 110, and there were

numerous heat-related illnesses and deaths in the surrounding area.[5]  (Id.)

Upon arrival, Marvel spoke to Defendant Paul Micun, who had been the

community service supervisor since 2004.  (Micun Dep. 14:11-19, 44:5-14.)  According to

---

4.   There is a question as to the length of time Marvel was required to perform community service work.  Plaintiff
argues that Marvel was actually scheduled for four days of community service work, citing to the deposition of
Defendant Paul Micun, supervisor at the Emergency Training Center.  Micun testified that Plaintiff signed in for
service on the morning of July 31, 2006 and said, "I work in construction.  I'm here for four straight days."  (Defs.'
Mot. Summ. J., Ex. 4, Paul Micun Dep. ("Micun Dep."), 44:5-45:11, Oct. 1, 2008.)  For purposes of summary
judgment review, the Court accepts Plaintiff's representation.

5.   Plaintiff attaches as exhibits numerous depositions from witnesses who testified as to the extreme heat on the
date of Marvel's death.  (PSUF ¶ 30.)  As this fact is undisputed by the parties, however, the Court does not cite each
of these pieces of evidence.

Micun, after all of the community service workers signed in, he asked if anybody had any construction experience since there were union bricklayers that could use some help.  (Id. at 44:18-45:3.)  When he asked for volunteers, four gentlemen came forward, including Marvel, who indicated that he worked on a crane in Philadelphia.  (Id. at 45:3-11.)  The other volunteers were Edmund Oponski, Aaron Keenen, and a third unidentified individual.  (PSUF ¶ 40.)  According to Micun, Marvel volunteered to do the construction work because "[h]e said he had construction experience and he would be more than happy to stay on site instead of going out picking up trash or going someplace else."  (Micun Dep. 54:20-55:5.)  Had Marvel, as a Fast Track applicant, decided not to volunteer for the construction work, he would have been assigned to one of the vans of the regular crew supervisors.  (Supplee Dep. 39:10-19.)  There were multiple sites for community service work in Delaware County, most of it being outdoor work, but some of it being indoor work.  (Omlor Dep. 63:13-24.)

In connection with his chosen assignment, Marvel spent his day passing cinder blocks from a palette on scaffolding that was twenty feet high to the union workers who were laying the blocks.  (Micun Dep. 45:20-46:10.)  Although Plaintiff argues that Marvel worked all day in direct sunlight, the evidence reflects otherwise.  Edmund Oponski, one of the other community service workers, testified that there was a roof over the structure in which they were working, but, as the structure was unfinished, there was a hole in the room through which some sun was coming down on the workers.  (Defs.' Mot. Summ. J., Ex. 7, Edmund Oponski Dep. ("Oponski Dep."), 31:3-12, Sep. 10, 2008.)  He estimated that approximately one-third of the work they performed was done in direct sunlight.  (Id. at  80:16-19.)  Michael Patrick Tuttle, one of the union employees at the site, estimated that most, if not all of the work performed by both

the union employees and the community service workers was done in the shade.  (Defs.' Mot. Summ. J., Ex. 8, Michael Patrick Tuttle Dep. ("Tuttle Dep."), 12:18-13:10, Jan. 14, 2009.) Finally, although Micun agreed that there was direct sunlight coming through the hole in the roof, he noted that it was "[v]ery limited" and that Marvel's work in the direct sunlight was on and off throughout the day.  (Micun Dep. 57:14-23, 78:24-79:3.)  Micun also admitted, however, that he never considered putting a tarp over the hole in the roof to avoid any work being done in the direct sunlight.  (Id. at 57:2-18.)  The workers were provided with a five-gallon jug filled with ice water, which was sufficient to last through the day.  (Id. at 57:24-59:3; Oponski Dep. 33:13-34:3.)  Further, the workers had several breaks during the day, as needed.  (Oponski Dep. 79:6-22.)

Marvel finished his community service work on July 31, 2006, without incident, at approximately 3:30 in the afternoon.  (Micun Dep. 48:21-49:1.)  Micun testified that Marvel did "fine" during the course of that work day.   (Id. at 45:15-17.)   That night, Marvel told his wife that his shoulders were very sore and he was exhausted, and complained that he had to wear a scarf over his face from all the dust.  (Defs.' Mot. Summ. J., Ex. 9, Grace Marvel Dep. ("G. Marvel Dep."), 16:8-17, Oct. 28, 2008.)  He did not, however, express any concerns about returning the next day to do the same work.  (Id. at 16:18-17:9.)

The following day, Marvel reported for community service wearing a short sleeve, button-down shirt and blue jeans.  (Micun Dep.  49:11-24.)  Again, he volunteered to do the same work he did the day before.  (Id. at 50:1-4.)  During the course of the morning, Marvel did not make any remarks to Oponski about not feeling well and did not look pale.  (Oponski Dep. 81:21-82:4.)  Approximately three hours into the work day, however, Oponski noticed that

Marvel did not want any water, was not looking good, and seemed somewhat flushed.  (Id. at

78:1-8, 79:1-5.)  Around 10:45 a.m., Micun claims to have told all of the community service

workers to come down and take a break since he had just brought fresh water.  (Micun Dep.

71:3-73:4.)  Oponski, on the other hand, said that he was the one who told Marvel to take a

break.  (Oponski Dep. 35:11-24.)  Within fifteen to twenty seconds thereafter, someone yelled, "a

man down."  (Micun Dep. 73:2-74:22.)  Oponski saw Marvel fall and hit his head.  (Oponski

Dep. 82:4-22.)  Tuttle also saw Marvel, who was leaning on the pole next to the water cooler,

just collapse.  (Tuttle Dep. 11:10-25.)

       Upon Marvel's collapse, Micun ran to Marvel immediately and found him lying

on his right side with some blood on his forehead.[6]  (Micun Dep. 74:23-75:20; Tuttle Dep. 13:22-

14:6; Oponski Dep. 37:23-38:11.)  He was soaking with sweat and semiconscious.  (Oponski

Dep. 37:11-20.)  Micun began performing CPR in an attempt to revive him and asked some of

the other men to wipe Marvel's chest.  (Micun Dep. 77:1-12; Tuttle Dep. 13:22-14:6.)  Oponski

immediately called his wife, Nicola Vesty, who was a telemetry nurse, and Micun started

unbuttoning Marvel's shirt and checking his vitals.[7]  (Oponski Dep. 38:23-39:5.)  Per Ms.

Vesty's instructions, the other men began putting ice under his armpits and an ice water-soaked

shirt around his neck.  (Id. at  39:6-24.)  Micun called George Morgan, who was in the office, and

told him to call 911.  (Micun Dep. 79:17-80:8.)  As Marvel's pulse started fading, Micun called

Morgan again and told him to notify the EMT's that CPR was in progress, which, according to

---

6.   Plaintiff asserts that Oponski testified that Micun did not arrive until later.  (PSUF ¶ 57.)  The citation provided
by Plaintiff actually shows Oponski testifying that Micun arrived "*within* two minutes."  (Oponski Dep. 38:2-10
(emphasis added).)

7.   Notably, Nicola Vesty, was not working at the hospital when her husband called her, but was sitting by her
backyard pool.  (Defs.' Mot. Summ. J., Ex. 10, Nicola Vesty Dep. ("Vesty Dep."), 14:15-24, Sep. 10, 2008.)

Micun, signified that Marvel was in cardiac arrest.  (Id. at 84:12-86:2.)  After four to five cycles

of CPR and approximately five to ten minutes after Marvel collapsed, both the Darby Township

police and the paramedics arrived separately.  (Id. at 88:3-90:18; Tuttle Dep. 14:7-11.)  The

paramedics put an air tube down his throat and hooked him to a heart monitor.  (Micun Dep.

90:12-91:21.)  When they put him on the stretcher to take him to Mercy Fitzgerald Hospital, he

still had a heartbeat and was breathing.  (Id. at 93:1-18.)

      After Marvel was taken by the paramedics, the other community service workers

were visibly upset.  (Id. at 94:9-18.)  Micun told them to take a long lunch and come back.[8]  (Id.

at 94:18-95:11; Oponski Dep. 43:2-16.)  Micun returned to the office sweating and told Morgan

that he could still "taste the blood" from Marvel.  (Def.'s Mot. Summ. J., Ex. 11, George Morgan

Deposition ("Morgan Dep."), 69:12-70:3, Oct. 21, 2008.)  During the lunch break, and within

fifteen minutes of the ambulance leaving, Oponski heard from his wife again and she told him

that Marvel had been declared dead on arrival at the hospital.  (Oponski Dep. 52:22-53:4.)

Oponski gathered Marvel's things that were left at the site and brought them over to Micun in the

office.  (Id. at 53:21-24.)  He informed Micun that Marvel was dead, and Micun expressed

"genuine sorrow." (Id. at 54:1-17.)  Oponski indicated that they were all upset and Micun agreed

to allow the workers to go home.[9]  (Id. at 54:1-17; Micun Dep. 99:13-100:20.)  The paid

8.   Plaintiff's Statement of Undisputed Facts contains extensive argument as to the outrageousness of Micun's directive to the other workers that they go to lunch and come back in an hour.  (PSUF ¶ 70.)  Plaintiff's counsel's interpretation of whether Micun's actions were questionable, offensive, or "conscious-shocking" is irrelevant to the facts as they occurred.

9.   The parties dispute the interpretation of the testimony as to whether Micun told them to go home, or whether Oponski said the men were leaving and Micun simply agreed.  This fact is not material since, in either event, Micun undisputedly excused the workers from service without hesitation.  Oponski never indicated that Micun resisted, argued against, or even flinched at the community service workers leaving for the day.  (Oponski Dep. 44:7-15; 93:2-4.)

contractors left around 12:30 or 1:00 p.m., also due to the shock of the unfortunate incident, not because of the heat.  (Micun Dep. 105:4-8; Tuttle Dep. 14:12-24.)

The emergency room physician at Mercy Fitzgerald, Dr. Rosen, concluded that Marvel died from a heart attack that was not heat-related.  (Defs.' Mot. Summ. J., Ex. 12.) Subsequently, the Delaware County Medical Examiner, Dr. Frederic Hellman, called Grace Marvel and indicated that he was comfortable with the treating physician's determination that the cause of death was cardiac-related and occurred with exertion.  (Def.'s Mot. Summ. J., Ex. 13, Frederic Hellman Dep. ("Dr. Hellman Dep."), 35:8-16.)  Originally, Mrs. Marvel turned down his offer for an autopsy, but had a change of heart the following day.  (Id. at 35:16-38:4.)  Upon full autopsy, Dr. Hellman found that Marvel's left anterior artery was ninety-five percent closed, and his right anterior artery was ninety percent closed.  (Id. at 44:17-46:12.)  The report indicated that death occurred as a consequence of "[a]rteriosclerotic coronary artery disease, with history of hypertension, associated with exertion," without any finding of heat-related causes.  (Defs.' Mot. Summ. J.. Ex. 12.)  As Dr. Hellman later explained, he believed Marvel's death was caused by his previously existing and very significant cardiac disease, associated with exertion.  (Dr. Hellman Dep. 60:16-23.)

Walter Omlor testified that, since the death of David Marvel, neither he nor the Criminal Justice Advisory Committee has expressly enacted any new policies for working in the heat.  (Omlor Dep. 129:13-24.)  Nonetheless, he has talked to his supervisors and told them that they must be aware of and sensitive to the risks to community service workers doing heavy labor in extreme weather conditions.  (Id. at 130:9-131:17; Defs.' Mot. Summ. J., Ex. 14, Marianne Grace Dep. ("Grace Dep."), 53:7-54:16, Sept. 17, 2008.)

10

## II.  PROCEDURAL HISTORY

Plaintiff Grace Marvel, individually and as executrix for the estate of David Marvel, initiated this civil action on November 30, 2007.  In her Complaint, she raises several constitutional claims under 42 U.S.C. § 1983.  Count I alleges that Defendants Omlor and Micun, acting under color of state authority, deprived Marvel of his constitutional rights under the Fourteenth Amendment, including his liberty interests in:  (1) bodily safety while performing community service; (2) freedom from deprivation of life without due process of law; and (3) an expectation of minimal standards for the safety, health, well-being, and security of community service workers.  (Compl. ¶¶ 39-43.)  In Count II of the Complaint, Plaintiff asserts that Defendant Delaware County violated Marvel's rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments by, in part, failing to develop or implement policies or procedures regarding the medical screening of ARD applicants or community service workers; failing to abide by the excess heat warning; failing to give consideration to extreme weather conditions or a worker's age; failing to provide adequate medical assistance to Marvel; and failing to properly train, supervise, and monitor Marvel during his community service.  (Id. ¶¶ 44-50.)

On December 26, 2007, Defendants filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).  By way of Memorandum and Order dated April 10, 2008, this Court denied the Motion to Dismiss on the ground that, taking the allegations of the Complaint as true, Plaintiff adequately stated a claim upon which relief may be granted.  Marvel v. Del. County, Civ. A. No. 07-5054, 2008 WL 1700536 (E.D. Pa. Apr. 10, 2008).  Subsequently, on January 19, 2009, Defendants filed the present Motion for Summary Judgment claiming that no evidence exists to support the facts alleged in the Complaint.  Plaintiff responded on February 1, 2009,

Defendants filed a Reply Brief, and Plaintiff filed a Sur-reply Brief.  Having considered all of the parties' briefing, together with their attached exhibits, and having listed to the parties' oral argument on May 20, 2009, the Court now turns to a discussion of the disputed issues.

## III.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pa, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

12

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pitt. Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

## IV.   DISCUSSION

Both counts of Plaintiff's Complaint are premised on 42 U.S.C. § 1983. "Section 1983 'is not a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). In order to state a cause of action under section 1983, a plaintiff must demonstrate both that (1) the defendants acted under color of state law; and (2) their actions deprived the plaintiff of rights secured by the Constitution or federal statutes. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

As the parties do not dispute that Defendants were acting under color of state law, the crucial analysis in this case focuses on the second prong of the section 1983 analysis. To prove this element, Plaintiff asserts that Defendants violated the substantive due process

protections of the Fourteenth Amendment in two ways.  First, she contends that all Defendants

are liable for a "state-created danger."  Second, she claims that, pursuant to <u>Monell v. Dept. of

Soc. Serv.</u>, 436 U.S. 658 (1978), Defendant County of Delaware developed a policy or custom

that resulted in a deprivation of both her and her husband's rights.  In light of Defendants'

challenge to both of these contentions, the Court addresses each individually.

### A.    <u>The State-Created Danger Theory (Count I)</u>

In the Memorandum and Order dated April 10, 2008, this Court found that the

allegations of the Complaint, taken as true, adequately set forth a state-created danger claim upon

which relief could be granted.  <u>Marvel</u>, 2008 WL 1700536, at *3-7.  Upon review of the

extensive exhibits submitted by the parties on summary judgment review, however, the Court

finds that many of the facts upon which we relied to deny the Motion to Dismiss are simply not

true.  Given the absence of any genuine issue of material fact, Plaintiff's state-created danger

claim must, as a matter of law, fail.

"Individuals have a constitutional liberty interest in personal bodily integrity that

is protected by the Due Process Clause of the Fourteenth Amendment."  <u>Phillips v. County of

Allegheny</u>, 515 F.3d 224, 235 (3d Cir. 2008).  While the Due Process Clause restricts the state's

power to act, the United States Supreme Court has expressly held that the Due Process Clause

does not impose an affirmative obligation on the state to protect its citizens.  <u>DeShaney v.

Winnebago County Dept. of Soc. Servs.</u>, 489 U.S. 189, 195-96 (1989).

The state-created danger theory, however, operates as an exception to that general

rule. <u>Phillips</u>, 515 F.3d at 235.  Under this theory, "[w]hen the affirmative exercise of state

authority either results in a citizen's injury or leaves a citizen more vulnerable to injury at the

hands of third party, the government contravenes the substantive due process protections of the

Fourteenth Amendment." D.N. and S.N. v. Snyder, __ F. Supp. 2d __, 2009 WL 824757, at *4

(W.D. Pa. Mar. 31, 2009).  In order to impose liability on the state actors, a plaintiff relying on

this concept must prove:  "(1) the harm ultimately caused to the plaintiff was foreseeable and

fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was

some relationship between the state and the plaintiff; and (4) the state-actor used his authority to

create an opportunity for danger that otherwise would not have existed." Phillips, 515 F.3d at

235 (citing Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006)).  A plaintiff must

establish all four of the foregoing essential elements to prevail on such a claim, and failure to

satisfy any one defeats the claim.  Smith v. School Dist. of Phila., Civ. A. No. 07-2080, 2009 WL

667455, at *3 (E.D. Pa. Mar. 10, 2009);  Magwood v. French, 478 F. Supp. 2d 821, 828 (W.D.

Pa. 2007).  In other words, "[t]o avoid entry of summary judgment . . ., [the plaintiff] must

present evidence which shows there is a genuine issue of material fact as to each element of his

state-created danger claim."  Smith, 2009 WL 667455, at *3 (citing Fed. R. Civ. P. 56(c)).

   Defendants, in this case, effectively concede that Plaintiff has satisfied the third

factor, but assert that Plaintiff has failed to produce evidence in support of factors one, two, and

four.  The Court therefore focuses on these latter three elements.

   **1.**  **Foreseeability**

   The first element of the state-created danger test requires that the harm ultimately

caused was a foreseeable and a fairly direct result of the state's actions.  Morse v. Lower Merion

Sch. Dist., 132 F.3d 902, 908 (3d Cir. 1997).  "A harm is foreseeable when a state actor has

actual awareness, based on concrete information, of a risk of harm to an individual or class of

individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm." Gremo v. Karlin, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005); see also Snyder, 2009 WL 824757, at *5. In order to establish foreseeability, the Third Circuit has not expressly required a plaintiff to allege a past history to show a defendant's knowledge.[10] Phillips, 515 F.3d at 237. Rather, it has observed that "these types of cases often come from unexpected or impulsive actions which ultimately cause serious harm." Id.; see, e.g., Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996) (holding that where police stopped husband and woman for intoxication, husband went home to take care of son, police left woman to her own means to get home, and woman subsequently suffered hypothermia, "a reasonable jury could find that the harm likely to befall [woman] if separated from [her husband] while in a highly intoxicated state in cold weather was indeed foreseeable.").

"Once the foreseeability element of the state-created danger test has been determined, the complaint must also allege that the attack or harm is a 'fairly direct' result of the defendant's acts." Phillips, 515 F.3d at 239. "Although this inquiry is unavoidably fact specific for each individual case, a distinction exists between harm that occurs to an identifiable or discrete individual under the circumstances and harm that occurs to a 'random' individual with no connection to the harm-causing party." Id.

---

10.    Notably, the Third Circuit has yet to clarify whether actual knowledge of a risk is required to establish deliberate indifference in a state-created danger claim. Patrick v. Great Valley School Dist., 296 Fed. Appx. 258, 262 n.3 (3d Cir. 2008) (citing Sanford v. Stiles, 456 F.3d 298, 310 (3d Cir. 2006) ("We leave to another day the question whether actual knowledge is required to meet the culpability requirement in state-created danger cases. On the one hand, the Supreme Court has held that actual subjective knowledge of a risk is required for at least some Eighth Amendment claims. . . . However, the Court has also held that the 'obviousness' of a risk can be sufficient for liability in other cases. . . . [W]e have not addressed the question as it relates to underlying state-created danger claims[, and] [t]here is currently a divide among the circuits on this issue."). For purposes of summary judgment in this case, this Court assumes that actual, subjective knowledge is not required.

In this case, the Court finds that Plaintiff has produced sufficient evidence to establish foreseeability.  It is undisputed that the National Weather Service had issued an Excessive Heat Warning for Delaware County from July 31, 2006 to August 3, 2006.  (Pl.'s Opp. Mot. Summ. J., Ex. J, 3.)  For both days, the heat index values reached up to 110 and there were several heat-related illnesses and deaths in the surrounding area.  (Id.)  Marvel was fifty-nine years of age, making him advanced in age.  Moreover, he was not just a random individual, but rather was part of a discrete group of people working in the state-run community service program.  Whether or not Defendants knew or had reason to know of any previously existing cardiac condition is irrelevant.  A reasonable jury could arguably find that the harm likely to befall an individual, such as Marvel, performing physical labor in excessive heat was obvious and, thus, foreseeable.

### 2. <u>Actions that Shock the Conscience</u>

Plaintiff's cause of action, however, does not fare as well under the second inquiry – whether Defendants acted with a degree of culpability that "shocks the conscience."  <u>Bright</u>, 443 F.3d at 281.  The Third Circuit has held that, in making this determination, there is a continuum, relating to the circumstances of each case, upon which the degree of culpability required to establish such a claim must be measured, relating to the circumstances of each case.  <u>Sanford v. Stiles</u>, 456 F.3d 298, 309-10 (3d Cir. 2006); <u>see</u> <u>also</u> <u>Patrick v. Great Valley School Dist.</u>, 296 Fed. Appx. 258, 262 n.3 (3d Cir. 2008) ("Whether a state actor's conduct shocks the conscience depends on the particular factual circumstances, and cannot be determined by reference to an inflexible standard.").  A distinction exists between urgent situations requiring action in haste and under pressure and situations in which state actors have the time and "luxury

of proceeding in a deliberate manner." Rivas v. City of Passaic, 365 F.3d 181, 195 (3d Cir.

2004).  When a state actor has the opportunity to make a careful and unhurried judgment,

deliberate indifference on the part of the state will be sufficient to shock the conscience.  See

County of Sacramento v. Lewis, 523 U.S. 833, 850 n.10, 118 S. Ct. 1708, 1718 n.10 (1998);

Schieber v. City of Phila., 320 F.3d 409, 418 (3d Cir. 2003); Kaucher v. County of Bucks, 455

F.3d 418, 426-27 n.4 (3d Cir. 2006).

       Nonetheless, deliberate indifference remains "a stringent standard of fault,

requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." Bd. of County Commr's v. Brown, 520 U.S. 397, 410 (1997); Kaucher, 455 F.3d at 427

n.4.  The United States Supreme Court has equated deliberate indifference with criminal

recklessness, requiring proof that a state actor "disregards a risk of which he is aware." Farmer

v. Brennan, 511 U.S. 825, 836-37 (1994).  Declining to adopt an objective standard, the Supreme

Court went on to hold that "an official's failure to alleviate a risk that he should have perceived

but did not . . . cannot under our cases be condemned . . ." Id. at 838.  "The Third Circuit Court

of Appeals has stated frequently that behavior which is merely negligent does not shock the

conscience." Yatsko v. Berezwick, Civ. A. No. 06-2480, 2008 WL 2444503, at *5 (M.D. Pa.

Jun. 13, 2008) (citing cases).

       In a factually analogous case cited by Defendants, the Fourth Circuit emphasized

the presumption against a state created danger action under section 1983, particularly where the

case sounds solely in state tort law. Waybright v. Frederick County, MD, 528 F.3d 199 (4th

Cir.), cert. denied, 129 S. Ct. 725 (2008).  The decedent, in that case, Andrew Waybright, was a

trainee for the Frederick County Fire Department. Id. at 201.  Just before seven in the morning,

18

the new recruits gathered for outdoor physical training.  Id. at 201-02.  The supervising

firefighter, Jeffrey Coombe, drove the recruits hard, telling them that he did not like quitters and

did not like to hear "I can't."  Id.  at 202.  For an hour that morning, with temperatures rising to

eighty-four degrees and a heat index of ninety-six, the recruits ran 4.3 miles, did squats, pushups

and other calisthenics, and ran wind sprints.  Id.  Coombe did not have water, communications,

transportation, or other first-aid equipment.  Id.  Many of the recruits showed pronounced

exhaustion and one, who told Coombe that he was dizzy, was told to rest.  Id.  Waybright began

looking sick and pale during the workout and, although another recruit asked if he wanted to say

something to Coombe, Waybright declined.  Id.  As the session was concluding, at about 8:10

a.m., Waybright collapsed, but still tried to crawl back to the Training Center, saying "I want to

finish with my class."  Id.  Coombe told him to rest where he was.  Id.  Two bystanders offered to

call 911, but another firefighter, Eckhardt, said Waybright was "just played out," and there was

no need to call.  Id.  Coombe stayed with Waybright briefly before leaving and assigning

Eckhardt to watch over him.  Id.  Upon return to the Training Center, Coombe sent another

firefighter to get a pickup truck to get Waybright.  Id.  While Eckhardt waited with him,

Waybright lost consciousness.   Id.  Eckhardt had no phone or radio, so when the truck arrived,

he told the driver to call 911.  The truck brought a paramedic back to the scene, but the driver

could not find any medical equipment.  Id.  At about 8:15 a.m., Waybright went into cardiac

arrest.  Id.  The paramedic administered CPR, and soon thereafter an ambulance arrived to take

Waybright to the emergency room, where, at 9:22 a.m., he died.  An autopsy revealed that he had

no preexisting conditions and died of hyperthermia (heat stroke).  Id.

_____Although originally seeking a remedy in state court, Waybright's parents later filed suit in federal court alleging, in part, a state-created danger theory under section 1983.  Id. at 203.  The district court granted summary judgment in favor of defendants.  Id.  On appeal, the Fourth Circuit noted that the United States Supreme Court has "established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected," and that the presumption is rebuttable only by showing "governmental conduct so 'arbitrary' and 'egregious' that it 'shocks the conscience,' usually because a state actor intended harm without justification." Id. at 205 (quoting County of Sacramento, 523 U.S. at 845-46).  The court went on to reason that "[t]he state-created danger theory in the present case portends just such federal displacement of state authority over state activities, for it would potentially set up a federal question whenever an accident happens during activities sponsored by the state."  Id. at 208.  Declining to rule in hindsight, the court found no deliberate indifference in either Coombe's initial decision to go on the run without water or other supplies, or his relative lack of reaction after Waybright initially collapsed.  Id. at 208-09.  Ultimately, it rejected the plaintiffs' claim, finding that Coombe's conduct was "a far cry from shocking the conscience.  It was, rather . . . an under-reaction – that is, a misjudgment.  Whether it was a negligent misjudgment is not for us to say, but misjudgments such as these are 'categorically beneath the threshold of constitutional due process.'"  Id. (quoting County of Sacramento, 523 U.S. at 849).

Although Waybright is not controlling – and presents a somewhat stricter stance against the state-created danger theory in the face of more extreme facts – the Court finds its reasoning instructive to our analysis of the present case.  In originally declining to grant Defendants' Motion to Dismiss, this Court applied the deliberate indifference standard and found

that the Complaint had sufficiently established conscience-shocking behavior by alleging that the Defendants required the community service workers to report to outside duty in extreme heat, failed to provide sufficient water for the workers, declined to allow the workers to use cell phones to call family members to bring water, and neglected to provide the workers with sufficient protection from direct sunlight such as a tent or canopy.  Marvel, 2008 WL 1700536, at *4-5.

Upon summary judgment review, however, the Court finds that all of these facts have been unequivocally disproved by the evidence.  As set forth above, Marvel selected July 31, 2006 and August 1, 2006 as his dates for community service.  (Omlor Dep. 54:1-56:7.)  While not asked, Marvel made no affirmative efforts to advise anyone of any known medical conditions or concerns he had about the weather.  (Id. at 162:17-163:4.)  On July 31, 2006, Micun asked all of the community service workers if anybody had any construction experience and was willing to help the union bricklayers.  (Micun Dep. 18:3; Oponski Dep. 17:20-18:7.)  Marvel volunteered, indicating that he had construction experience, without qualifying his experience as limited to working in an air-conditioned crane.  (Micun Dep. 45:3-11, 54:20-55:5.)  Several witnesses testified, without contradiction, that had Marvel not volunteered for this work, he would have been assigned to one of the vans of the regular crew supervisors doing work at a different site. (Supplee Dep. 39:10-19; Omlor Dep. 63:13-24.)

Although the day was indisputably hot, the regular paid union employees were doing physical labor at the site as well.  Michael Tuttle, one of the union employees, testified that he regularly worked through such hot weather.  (Tuttle Dep. 14:21-15:6.)  The state supplied a five-gallon water cooler for the community service workers, which never ran out during the day.

21

(Micun Dep. 57:24-59:3; Oponski Dep. 33:19-34:3.)  The workers also had several rest periods during the day and water breaks were available as needed.  (Oponski Dep. 79:6-22; Tuttle Dep. 10:19-11:4.)  Contrary to the allegations of the Complaint, the evidence has established that only a limited portion of the work was done in direct sunlight and that work was done on and off throughout the day. (Oponski Dep. 80:16-19; Micun Dep. 57:14-23; 78:24-79:3; Tuttle Dep. 12:18-13:10.)

Ultimately, Marvel completed his first day without problem, except for his complaints that he was tired and sore – expected and not unusual ailments after any day of physical labor.  (G. Marvel Dep. 16:8-17.)  Micun believed that Marvel did "fine," and neither he nor Marvel expressed any concerns about continuing work in the same conditions the following day.  (Micun Dep. 45:15-17; G. Marvel Dep. 16:18-17:9.)  Omlor testified that, in his nineteen years of experience with the community program, he has seen in excess of one hundred thousand workers, working in all types of weather, but had never seen any tragedy similar to the one that befell Marvel.  (Omlor Dep. 158:8-159:6.)  In short, nothing in the evidence did or should have alerted Defendants to either call off community service work the following day or excuse Marvel from service.[11]

_____

11.   In an effort to show that Defendants had actual notice of harm due to their failure to medically screen community service workers, Plaintiff again cites to the case of Lawrence Malar, who reported for community service in Delaware County approximately five months prior to Marvel's death.  Although he produced a doctor's note advising that his community service needed to be limited to non-strenuous activities due to multiple medical conditions, he was nonetheless required to work manual labor in extremely cold weather and would up hospitalized for five days with pneumonia.  (PSUF ¶ 7.)  Notably, however, Mr. Malar unequivocally testified that prior to reading an article about Marvel's death in the newspaper, he had never spoken to anyone in the community service department of Delaware County and had never made any complaints.  (Defs.' Mot. Summ. J., Ex. 15, Lawrence Malar Dep. ("Malar Dep."), 64:2-66:21, Oct. 15, 2008.)  Logically, then, Malar's case, which was first brought to light after Marvel's death, could not have possibly provided noticed to Defendants before Marvel's death.

Finally, after Marvel's collapse Defendants' actions showed nothing resembling deliberate indifference to his situation.  Micun immediately ran to Marvel's side and performed CPR in an attempt to revive him.  (Micun Dep. 77:1-12; Tuttle Dep. 13:22-14:6.)  Micun also had someone from the office call 911, and within five to ten minutes of his collapse, Marvel was in an ambulance.  (Micun Dep. 84:12-86:2, 88:3-90:18; Tuttle Dep. 12:7-11.)  Following Marvel's departure from the scene, Micun told the other community service workers to take lunch and come back afterwards.  (Micun Dep. 94:18-95:11.)  Nothing in the record, either directly or by inference, supports Plaintiff's assertion that Micun's directive was "outrageous" or "inhumane."  Albeit imperfect, Micun's statement was nothing more than an immediate and human reaction to a shocking situation.  During that break, Oponski learned that Marvel had died and went to inform Micun.  (Oponski Dep. 52:22-53:4, 54:1-17.)  With no reported hesitation, anger, or threat of penalty, Micun, either on his own or on the suggestion of Oponski, dismissed all the community service workers for the day.  (Id. at 54:1-17, Micun Dep. 99:13-100:20.)

Plaintiff's efforts to create a genuine issue of material fact on this point are unfounded.  It is well-established that a plaintiff cannot create a fact issue with evidence of facts that cannot be proven at trial.  10A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 2727, 156 (1983).  "Rule 56(e) requires the adversary to set forth facts that would be admissible in evidence at trial.  Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless."  Id.

Plaintiff's evidence suffers from precisely these defects.  First, Plaintiff cites to the deposition testimony of several lay witnesses, including Nicola Vesty, Darby Township

23

Police Department Officer Patrick Hennessy, Edmund Oponski, and Eugene Bonner, all of whom expressed their opinion that it was too hot for anyone, especially a fifty-nine year old man, to safely be doing physical labor and that community service work should have been cancelled. (Pl's Opp. Mot. Summ. J. 5-7.)  Such evidence is clearly impermissible under Federal Rule of Evidence 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.  Clearly, the cited testimony from these witnesses relies on specialized knowledge of whether a man of Marvel's age, physical condition, experience, medical condition, and fitness could work outdoors with minimal risk that day.  Although the witnesses could justifiably relate their own description of the weather and how they personally felt that day, any speculation as to whether it was medically safe for Marvel to be working outside that day is not rationally based on their own perceptions.[12]

---

12.   Plaintiff also cites to the testimony of several witnesses who generally discussed the dangers of working in excessive heat conditions.  Plaintiff's characterization of such testimony is misleading.  For example, Plaintiff's brief argues that "Timothy Cavanaugh, one of the paramedics, testified that 'they warn you not to do things' during and excessive heat warning."  (Pl.'s Opp. Mot. Summ. J. 7.)  In actuality, Mr. Cavanaugh stated as follows:

> Q.   Like to the best of your understanding, is there certain things that people should or not do if it's really hot, like an excessive heat warning, members of the general public?
>
> A.   They warn you not to do things.  *I don't know whether you should or shouldn't do them.*

(Pl.'s Opp. Mot. Summ. J., Ex. U, Timothy Cavanaugh Dep. 12:16-23, Jan. 14, 2009 (emphasis added).)
            Similarly, Plaintiff cites to George Morgan's testimony for the proposition that a person should not overexert themselves during an excessive heat warning.  Contrary to Plaintiff's characterization of his testimony,

(continued...)

Moreover, Plaintiff's reliance on the testimony of Dr. Kessler, Marvel's primary care physician, is similarly unavailing.  Dr. Kessler opined that he would not have recommended Marvel doing heavy physical labor in temperatures that were in the mid to upper nineties and that, regardless of whether a patient has a known history of heart disease, he would advise his older patients to generally avoid the stresses of this environment due to the risk of heat stroke.  (Dr. Kessler Dep. 70:2-72:24.)  The mere fact, however, that Marvel's family doctor would have offered such advice in hindsight does not establish deliberate indifference on the part of either Micun or Omlor sufficient to rise to the level of a constitutional violation.

Finally – and perhaps most controversial in terms of evidentiary value – is the "expert report" of Victor Lofgreen, Ph.D., a "correctional consultant," who opines that Defendants demonstrated deliberate indifference to the health and safety of the community service workers.  (Pl.'s Opp. Mot. Summ. J., Ex. D.)  Dr. Lofgreen makes numerous conclusions

---

12.  (...continued)
however, Morgan did not say that no one should work in such heat.  Rather, he explained.

A.  My understanding is that you have to be careful if you're working out in the heat.  Keep hydrated.  Make sure that you can rest when possible. Don't – don't overexert.  And just watch for signs of becoming overheated.

Q.  I mean, do you – you said be careful working in the heat.  Should people be working in heat during an excessive heat warning, do you think?

* * *

A.  Just from my background, the people I dealt with, firefighters, EMS personnel and police officers had to work in the heat.  So looking at it that way, you – yes, you have to work in the heat.

Q.  Okay.

A.  Okay.

Q.  I mean as far as the general public, what's your understanding if there's an excessive heat warning whether they would be working outside during that?

A.  I guess if you could avoid it, you would avoid it.

(Morgan Dep. 49:4-50:10.)

that Defendants showed "deliberate indifference" by failing to have a policy for screening community service workers; by not including considerations of weather in job assignment policies; by not having policies to guide the selection, hiring, training, and supervision of community service work supervisors; and by ignoring the circumstances of the weather. (Id.)  As aptly noted by Defendants, however, Dr. Lofgreen's opinion is based on a recitation of facts without citation to and finding no support in any evidence of record.  For example, Dr. Lofgreen stated that Marvel was "assigned" the task of unloading and stacking cinder blocks, that he was effectively "in custody," that he was not free to make decisions about his personal safety and well-being, and that he was required to obtain a satisfactory rating to avoid being penalized.[13] (Id. at 5.)  Yet, as described in detail above, the evidence provided by the parties either flatly contradicts these statements or renders them baseless.  Indeed, nothing in any evidence cited by Dr. Lofgreen establishes that a worker is penalized for seeking less strenuous community service work based on a valid medical reason.

---

13.   Specifically, Dr. Lofgreen stated that:

> People who volunteer to perform community service as part of the ARD program are essentially taken into custody during the time of their community service. They report to duty at the assigned time of the their community service. They report to duty at the assigned time. They are given work assignments by the work supervisors of communities service program, and they are required to satisfactorily perform the duties of that work assignment. If they do not provide satisfactory work performance, or complete the assigned tasks during the work period they are given a[n] unsatisfactory rating by the work supervisor. Receiving an unsatisfactory rating leads to the Court adding workdays to their term of service.

(Id. at 5.)  While his report generally lists the evidence he reviewed, Dr. Lofgreen provides no specific supporting citation to any records, reports, testimony, or other evidence for this statement.  Nor can this statement be classified as an expert opinion, as it has no foundation in any specialized knowledge.

To the extent an expert's opinions are predicated upon factual assumptions, those assumptions "must find some support in the record."  Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1142 (3d Cir. 1990) (quotation omitted).  Where the factual assumptions are unfounded, a court, on summary judgment review, is free to disregard the expert's opinions.  Id.  Accordingly, Dr. Lofgreen's mere conclusion, without factual basis, that the Defendants should have engaged in medical screening and/or called off community service is insufficient to create a genuine issue of material fact.[14]  See U.S. v. Hall, 93 F.3d 1337, 1344 (7th Cir. 1996) ("Even though experts are entitled to give their opinion on an ultimate issue in the case . . . this does not mean that the opinion may be given divorced from the scientific, medical, or other expert basis that qualified the witness in the first place.").

In short, even applying the lower deliberate indifference standard, nothing in the record creates a genuine issue of material fact as to whether Defendants' conduct was conscience-shocking.[15]  While it was an unusually hot day, it was not too hot for labor of any kind.  Marvel volunteered for construction work, was provided adequate water and breaks, and, when taken ill, was given immediate medical attention.  Although he could have, upon request, performed his community service at an alternate location, at no point did he suggest that he was physically unable to perform the work or indicate that he suffered from any medical condition which subjected him to a greater risk.  Defendants did not deliberately ignore a risk of which they

---

14.   Absent a proper motion in limine to exclude Dr. Lofgreen's report, the Court makes no ruling on the admissibility of this report as a whole.

15.   Plaintiff's Additional Statement of Undisputed Facts also discusses statements made by Omlor to Sherri Carafa, Marvel's daughter, the day after her father's death.  Specifically, Carafa averred that Omlor told her "[m]ost of these guys [community service workers] were assholes, but not your dad."  (PASUF ¶ 23; Pl. Opp. Mot. Summ. J., Ex. 4 ¶ 3.)  While this statement is offensive to any normal sensibilities, it is irrelevant to the legal determination of whether Defendants' acted in a manner that was deliberately indifferent to Marvel's constitutional rights.

were actually aware.  At most, if at all, Defendants' actions amounted to negligent disregard.  It is well-established, however, that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  Lewis, 523 U.S. at 849; see also Dubrow v. City of Phila., Civ. A. No. 07-507, 2008 WL 4055844, at *8 (E.D. Pa. Aug. 28, 2008).  Accordingly, the Court finds that Plaintiff has failed to satisfy this element.

### 3.    Affirmative Act

Under the final element of a state-created danger claim, "[l]iability . . . is predicated upon the states' *affirmative acts* which work to the plaintiff's detriment in terms of exposure to danger.  It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."  Bright, 443 F.3d at 282 (quoting  D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1374 (3d Cir. 1992) (*en banc*) (emphasis in original)).  Plaintiff must show "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."  Bright, 443 F.3d at 281.  In other words, a plaintiff must "allege an affirmative action, rather than inaction or omission."  Phillips, 515 F.3d at 236.  "[F]ailures to act cannot form the basis of a valid § 1983 claim."  Bennett ex. rel Irvine v. City of Philadelphia, 499 F.3d 281, 288 (3d Cir. 2007).  Repeatedly, the Third Circuit has declined to find that failures to act are sufficient to sustain a state created danger claim under section 1983.  Kaucher, 455 F.3d at 433 n.11 (citing Bright, 443 F.3d at 283-84 (failure to hold revocation hearing for an individual in violation of his parole prior to his killing an eight-year old girl); Morse, 132 F.3d at 907-08 (failure to prevent mentally disturbed individual from entering school and attacking teacher); Searles v. SEPTA, 990 F.2d 789, 794 (3d Cir. 1993) (failure to maintain railcars in a safe

condition); D.R. by L.R., 972 F.2d at 1376 (failure of school officials to investigate and stop instances of sexual abuse of students); Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990) (failure to file criminal charges against individual who repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim and her family)).

Notably, pleading an affirmative act by a state actor is not enough. The complaint must also plead a direct causal relationship between the affirmative act and plaintiff's harm. Kaucher, 455 F.3d at 432. Thus, once an affirmative action is alleged, "the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff." Id.; see also Phillips, 515 F.3d at 236-37. "Where the state's action is not the 'but for cause' of the plaintiff's harm, the fourth element is not satisfied." Kaucher, 455 F.3d at 433.

Plaintiff's argument fails to establish either part of this element. First, Plaintiff does not identify any affirmative action by Defendants that harmed Marvel or exposed him to danger. As noted above, Marvel voluntarily entered the ARD program in lieu of facing a trial, and had the option to choose his dates of service. He did not inform anyone about any medical condition which would limit his work. Further, on the first day of his service, he volunteered to work in construction, with full knowledge of the heat and the required exertional effort – no Defendant "assigned" him this task.[16] He returned for work the following day without expressing any concern to any Defendant about any threat to his health.

Plaintiff's current allegations that: (1) Defendants failed to medically screen him before giving him his community service work, (2) Defendant Micun failed to consider Marvel's

---

16. Although Plaintiff repeatedly argues that Marvel faced a penalty for taking this work, nothing in the evidence supports that assertion. Indeed, Oponski confirmed Micun's testimony that the workers were asked about their trades and abilities, and that certain men requested construction work. (Oponski Dep. 17:20-18:7, 74:2-19.)

age and the heat, and (3) Defendant Omlor failed to cancel all community service work in light of

the excessive heat warning all share the same fatal flaw – they set forth *omissions* and *inactions*

rather than affirmative misuse of state authority.  Such allegations of omission and inaction

sound in negligence.  As noted above, however, "mere negligence is insufficient to trigger

constitutional liability."  Fagan v. City of Vineland, 22 F.3d 1296, 1305 (3d Cir. 1994) (citing

Davidson v. Cannon, 474 U.S. 344, 347-48 (1986)).  Thus, even assuming Defendants could

have taken extra measures to ensure the safety of Marvel, nothing in the Due Process Clause

either obligated them to do so or rendered them deliberately indifferent for failing to do so.

Given such claims, no reasonable jury could find that Defendants affirmatively placed Marvel in

more danger than had they not acted at all.

        Second, even assuming *arguendo* that Defendants had some affirmative duty,

Plaintiff fails to prove that any action by Defendants was the "but for" cause of Marvel's injury.

As to the claim of failure to medically screen, Plaintiff repeatedly and vigorously emphasizes that

Marvel had no knowledge of any heart-related condition and never had a prior heart attack.

(PSUF ¶ 35.) Marvel's wife, Grace, averred that her husband had never seen a cardiologist, never

complained of chest pains or other symptoms of a heart attack, and otherwise had no history of

heart-related illness prior to the date of his community service.  (G. Marvel Aff. ¶¶ 6-7.)  The

logical inference from these assertions is that even had Defendants inquired into Marvel's

medical conditions prior to assigning him community service work, he would not have told

anyone of his significant cardiac disease.  Accordingly, the failure to medically screen him could

not have been the but for cause of his death.

Moreover, as to Plaintiff's claim of failure to call off community service work in extreme weather conditions, the clear evidence on the record unequivocally reveals that Marvel's death was not heat-related.  The emergency-room physician at Mercy Fitzgerald Hospital, who fully examined Marvel upon his arrival, concluded that Marvel died from a heart attack that was not heat-related. (Defs.' Mot. Summ. J., Ex. 12.)  Subsequently, upon complete autopsy, Delaware County Medical Examiner Dr. Hellman found that Marvel's left anterior artery was ninety-five percent closed, and his right anterior artery was ninety percent closed.  (Dr. Hellman Dep. 44:17-46:12.)  He explained that a person with such blockages is at risk of suffering cardiac death at any time, regardless of whether he is exerting himself.  (Id. at 47:16-22.)  Dr. Hellman also concluded that Marvel's death occurred as a consequence of "[a]rteriosclerotic coronary artery disease, with history of hypertension associated with exertion." (Defs.' Mot. Summ. J., Ex. 12.)  Based on the fact that Marvel's electrolyte studies of vitreous fluid did not demonstrate values indicative of dehydration, and noting Marvel's past regular employment at construction sites, Dr. Hellman opined that Marvel's death was not heat-related.  (Dr. Hellman Dep. 55:10-58:21.)  Thus, the logical inference is that the excessive heat had little bearing on Marvel's collapse.

In an effort to dispute this latter finding, Plaintiff relies on:  (1) deposition testimony from lay witnesses; (2) the expert report of Dr. Lofgreen; and (3) the expert report of Dr. Cohen.  First, Plaintiff cites to deposition testimony from Edmund Oponski, Oponski's wife Nicola Vesty, and Aaron Keenan, one of the other community service workers who was with David Marvel on that date, all of whom stated that they "absolutely believed" that Marvel's death was heat-related.  (PASUF ¶¶ 19-22.)  Again, however, under Federal Rule of Evidence 701, the

Court cannot find that testimony admissible.  Neither the two non-medically trained individuals nor the one nursing professional ever examined Marvel, read any of his medical records, or knew of his pre-existing artery blockages.[17]  Accordingly, none of their testimony can create a genuine issue of material fact as to the medical cause of Marvel's death.

The Court must similarly find that the report of Dr. Lofgreen does not create a genuine issue of material fact as to the cause of Marvel's death.  Dr. Lofgreen opined that Micun and Omlor's "deliberate indifference to the health and well being of Mr. Marvel" and their disregard of "the circumstances of the weather in extreme heat conditions, the difficulty of the work task assigned, and the inability of Mr. Marvel to perform that level of physical labor . . . led to the death of Mr. Marvel within four hours."  (Pl.'s Opp. Mot. Summ. J., Ex. D.)  "Although an expert's testimony is not limited to the area in which he or she has specialized, the party offering the expert must demonstrate that the expert has the necessary expertise to provide reliable evidence."  Ferris v. Pa. Fed'n Bhd. of Maint. of Way Employees, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001); see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 322 (3d Cir. 2003).  "If the expert testimony falls outside a witness's expertise, the court should exclude it."  Ferris, 153 F. Supp. 2d at 743.  Plaintiff makes no effort to establish Dr. Lofgreen as a medical expert, or even an expert with any form of remotely scientific training.  Accordingly, Dr. Lofgreen's opinion as to the cause of Marvel's death constitutes nothing more than an inadmissible lay opinion.

---

17.   Even Nicola Vesty, who was a telemetry nurse, admitted that, in the course of her job, she had never seen anyone with heat stroke, let alone heat stroke that caused a heart attack.  (Vesty Dep. 18:24-19:4.)  She went on to state that, "I have kids, I've seen, you know, a slight dehydration and heat issues but not heat stroke.  *I'm not sure if that's what he had.*  But given the temperature of the day and the work they were doing, it could have easily been the case."  (Id. at 19:4-19:10 (emphasis added).)

Finally, the report of Plaintiff's medical expert, Dr. Cohen, fails to create a genuine issue of fact as to causation.  In his Supplemental Report (the original of which Plaintiff did not supply to the Court), Dr. Cohen concludes that:

> This case is very straightforward and easy for even a lay person to analyze.  It is well accepted that it is dangerous to do heavy work during an excessive heat wave warning.  Heavy work in such situations causes heat illnesses and some deaths.  The risk of heat-related illness and death is obviously higher in a 59-year old male with multiple atherosclerotic risk factors.  Mr. Marvel's cardiac arrest death was clearly caused by heavy work on a very hot day.

(Pl.'s Opp. Mot. Summ. J., Ex. I.)  The remainder of Dr. Cohen's Supplemental Report attempts to poke holes in the medical examiner's analysis, but does not cite to any examinations, reports, medical records, medical studies, journals, or other scientific basis for his own conclusion that Marvel's death was, in fact, heat-related.  (Id.)  Indeed, Dr. Cohen does not profess to reading any documentation other than Dr. Hellman's deposition.  (Id.)  In the context of summary judgment motions, the Third Circuit has demanded that the factual predicate of an expert's opinion must find some support in the record, and has emphasized that mere "theoretical speculations" lacking a basis in the record will not create a genuine issue of fact.  Pa. Dental Ass'n. v. Med. Serv. Ass'n., 745 F.2d 248, 262 (3d Cir. 1984) (quotations omitted).  "[A]n expert report that merely offer[s] 'conclusory opinions,' without explicit factual foundation, [is] insufficient to defeat a motion for summary judgment."  Portfolio Techs., Inc. v. Church & Dwight Co., Inc., Civ. A. No. 04-6340, 2006 WL 288082, at *3 (D.N.J. Feb. 6, 2006) (quoting Novartis Corp. v. Ben Venue Labs., Inc. 271 F.3d 1043, 1051 (Fed. Cir. 2001)).  Given Plaintiff's failure to demonstrate the basis on which Dr. Cohen provided his opinion, the Court

declines to rely on it as a basis to defeat summary judgment.

### 4.      Conclusion as to State-Created Danger

Taking all the evidence submitted by the parties, and all reasonable inferences which may be drawn from it, in the light most favorable to Plaintiff, the Court can find no genuine issue of material fact that precludes summary judgment.  Even accepting that Marvel was a foreseeable victim and that he had a special relationship with Defendants, Plaintiff puts forth no evidence upon which any reasonable juror could find either that any Defendant acted with deliberate indifference or that the Defendants engaged in an affirmative misuse of state authority that was the but for cause of Marvel's death.  "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  Lewis, 523 U.S. at 848.  Indeed, "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the states.'"  Id. (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)).  Any alleged missteps made by Defendants sound in nothing more than state common-law negligence and simply do not rise to the level of a constitutional violation.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Count I of the Complaint.[18]

---

18.    Defendants also seek qualified immunity on Count I for Defendants Micun and Omlor.  The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Restated more precisely, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness of the action assessed in light of the legal rules that were clearly established' at the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 818-819); see also Pro v. Donatucci, 81 F.3d 1283, 1286-87 (3d Cir. 1996).
            As set forth in detail above, Plaintiff has failed to make the threshold showing of a constitutional violation.  Absent such a showing, the Court need not conduct any further analysis. to find that Defendants Micun and Omlor are entitled to qualified immunity.  See Walter v. Pike County, Pa., 544 F.3d 182, 196 (3d Cir. 2008) (finding that because plaintiff could not establish a constitutional violation under a state-created danger theory, the

(continued...)

###### B.    Municipal Liability (Count II)

Count II of Plaintiff's Complaint asserts that Defendant County of Delaware violated Marvel's constitutional rights by:  (1) failing to develop or implement policies or procedures to screen ARD applicants for medical or physical conditions or medications that could adversely affect their ability to perform community service; (2) failing to develop adequate polices and procedures for assigning older applicants for the ARD Program less physically strenuous community service work; (3) failing to develop adequate policies or procedures for having ARD workers avoid extreme weather conditions; (4) failing to implement policies and procedures for protecting older community service workers; (5) failing to abide by the Excessive Heat Warning issued by the National Weather Service of Delaware County; (6) failing to properly train, supervise, and/or monitor Marvel during his community service; (7) failing to provide Marvel with sufficient water; (8) precluding community service workers from using their cell phones to call family members to bring them water during the day; (9) failing to provide Marvel with sufficient protection from direct sunlight; (10) failing to warn Marvel of the Excessive Heat Warning and of the dangers of performing heavy manual labor in oppressive weather conditions; (11) failing to postpone Marvel's community service work until a later date when conditions were not oppressive; (12) requiring Marvel to perform heavy manual labor that it had already contracted with a construction company to provide; (13) failing to provide

---

18.  (...continued)
court "need not move beyond this threshold question in the qualified-immunity analysis."); Ye v. U.S., 484 F.3d 634, 643 n.6 (3d Cir. 2007) ("As there was no constitutional tort, we need not reach the question of whether the law was clearly established. . . ."), cert. denied, 128 S. Ct. 905 (2008).  In any event, however, the evidence reveals that Micun's and Omlor's actions did not violate any clearly established law.  Pearson, 129 S. Ct. at 822.
        In addition, Defendants move to dismiss the punitive damages claim against Defendants Omlor and Micun.  Given our finding that they have committed no constitutional violation, the punitive damages claim must necessarily be dismissed.

adequate and timely medical assistance to Marvel; (14) requiring the remaining community

service workers to return to heavy labor in oppressive weather shortly after witnessing Marvel's

death and despite the ongoing Excessive Heat Warning; (15) failing to implement policies or

procedures for medically screening ARD workers following Marvel's death; (16) failing to

develop or implement adequate policies or procedures for avoiding extreme weather conditions

following Marvel's death; and (17) failing to develop or implement policies or procedures for

protecting older community service workers following Marvel's death.  (Compl. ¶¶ 44-50.)

Defendants again seek summary judgment on this claim.[19]

      In the seminal case of Monell v. Dept. of Soc. Serv., 436 U.S. 658 (1978), the

United States Supreme Court confirmed that "Congress *did* intend municipalities and other local

government units to be included among those persons to whom §1983 applies," but emphasized

that, "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id. at

690-91 (emphasis in original).  To establish section 1983 liability on such a governing body, the

plaintiff must identify either a "policy, statement, ordinance regulation or decision officially

adopted and promulgated by that body's officers," or "constitutional deprivations visited

pursuant to governmental 'custom' even though such a custom has not received formal approval

through the body's official decision making channels."  Id. at 690-691.  A policy is shown when

"a 'decisionmaker possessing final authority to establish municipal policy with respect to the

---

19.   Defendants argue that in order to establish municipal liability, there must be an underlying constitutional
violation of a plaintiff's rights by the individual state actors.  (Defs.' Mem. Supp. Mot. Summ. J. 28.)  This statement
is incorrect.  As the Third Circuit explained, "[t]he precedent in our circuit requires the district court to review the
plaintiff's municipal liability claims [under Monell and its progeny] independently of the section 1983 claims against
the individual [state actors], as the City's liability for a substantive due process violation does not depend upon the
liability of any [state actor]."  Kneipp, 95 F.3d at 1213 (citing Fagan, 222 F.3d at 1293-94).

action' issues an official proclamation, policy, or edict."  Beck v. City of Pitt., 89 F.3d 966, 971

(3d Cir. 1996) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990)).  A

custom is defined as "such practices of state officials so permanent and well-settled as to

constitute law," which can be established by showing the policy maker's knowledge and

acquiescence to the custom.  Id.  Alternatively, a custom or policy may be established from a

failure to train, supervise, or otherwise act, where that failure reflects a deliberate indifference of

officials to the rights of persons that come into contact with these municipal employees.  City of

Canton v. Harris, 489 U.S. 378, 387-88 (1989); Reitz v. County of Bucks, 125 F.3d 139, 145 (3d

Cir. 1997).  As succinctly summarized by the Third Circuit, "[t]here are three situations where

acts of a government employee may be deemed to be the result of a policy or custom of the

governmental entity for whom the employee works, thereby rendering the entity liable under §

1983:"

> The first is where the appropriate officer or entity promulgates a
> generally applicable statement of policy and the subsequent act
> complained of is simply an implementation of that policy.  The
> second occurs where no rule has been announced as policy but
> federal law has been violated by an act of the policymaker itself.
> Finally, a policy or custom may also exist where the policymaker
> has failed to act affirmatively at all, though the need to take some
> action to control the agents of the government is so obvious, and
> the inadequacy of existing practice so likely to result in the
> violation of constitutional rights, that the policymaker can
> reasonably be said to have been deliberately indifferent to the need.

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).

Beyond identification of a policy or customary failure to act, establishment of

section 1983 municipal liability requires a showing of causation.  "[I]t is not enough for a §1983

plaintiff merely to identify conduct properly attributable to the municipality."  Bd. of the County

37

Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).  Rather, the plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged).  The standard of causation is stringent and requires that "the identified deficiency . . . be closely related to the ultimate injury."  Canton, 489 U.S. at 391.

In the present matter, the sixteen different allegations in the Complaint describing the bases for Defendant Delaware County's liability can effectively be parsed into seven categories, as follows:

1.    Failure to develop or implement policies for screening applicants to the ARD program or community service workers for medical and/or physical conditions that would inhibit their ability to do community service work; and failure to develop policies for assigning older applicants less physically strenuous community service work. (Compl. ¶¶ 49(a),(b,)(c), & (m));

2.    Failure to develop or implement policies to have community service workers avoid extreme weather conditions and failure to abide by excessive heat warnings. (Compl. ¶¶ 49(d),(e),(f), & (l));

3.    Failure to properly train, supervise and/or monitor community service workers, provide such workers with sufficient water, allow them to call family members to bring water, provide them protection from direct sunlight, or advise them of excessive heat warnings.  (Compl. ¶¶ 49(g),(h),(i),(j), & (k));

4.  Failure to provide adequate and timely medical assistance to Marvel.  (Compl. ¶ 49(n));

5.  Requiring community service workers to return to heavy manual labor in oppressive heat shortly after witnessing Marvel's death.  (Compl. ¶¶ 49(o) & (p));

6.  Failure to implement policies for screening workers and ARD applicants for medical physical conditions after Marvel's death; and for having older workers not do strenuous work.  (Compl. ¶¶ 49(q),(r),(s) & (u));

7.  Failure to implement policies for avoiding extreme weather conditions after Marvel's death.  (Compl. ¶ 49(t).)

None of these allegations suffice for the Court to impose Monell liability on Defendant County

of Delaware.

### 1. Categories Five, Six, and Seven

As to categories five, six, and seven, the alleged failures constitute events

occurring after Marvel's death.  As such, Plaintiff cannot meet the burden of proving that these

actions, allegedly attributable to the municipality, directly caused a deprivation of Plaintiff's

federal rights.  While such assertions may theoretically carry slightly more weight should another

community service worker under the County Defendant's program face a similar tragedy, they

have no bearing on the case before us.[20]

### 2. Categories Three and Four

---

20.  In a tangential and somewhat odd discussion, Plaintiff argues that "[e]ven more disturbing is the fact that Delaware County, even after David Marvel's death and Lawrence Malar's hospitalization, continues to operate its department in a dangerous and life-threatening manner.  In 2007, one of Walter Omlor's community service supervisors was arrested for D.U.I. after he crashed his van containing community service workers into another vehicle, injuring the other driver!"  (Pl's Opp. Mot. Summ. J. 20 (emphasis in original).)  The Court fails to see the relevance of the unrelated actions of an individual not named as a Defendant in this case on the case before us.

Second, with respect to categories three and four, Plaintiff's <u>Monell</u> claim fails on multiple grounds.  As a primary matter, Plaintiff provides no factual support for such allegations.  In fact, as noted in detail above, Defendants have actually disproved the truthfulness of such claims through the production of undisputed evidence.

Moreover, even assuming such allegations could be proven, Plaintiff has offered only the particular facts and the specific conduct of the state actors on August 1, 2006, and has made no attempt to establish that such failures were actually "customs" or "policies" of the Delaware County ARD program.  Plaintiff provides no citation to any prior instances where Defendant failed to supply water to community service workers on excessively hot days, required them to work in direct sunlight, refused to allow them to call family members to bring them water, or failed to warn them of weather conditions.  Similarly, Plaintiff cites to no previous incident where a community service worker faced a medical emergency that was not properly responded to by County officials.  "While the particular actions of the state actors may prove a constitutional violation under the state-created danger theory, they do not evince a policy or custom that caused such conduct and cannot alone implicate municipal liability as required by <u>Monell</u> and its progeny."  <u>M.B. ex rel. T.B. v. City of Phila.</u>, Civ. A. No. 00-5223, 2003 WL 733879, at *7 (E.D. Pa. Mar. 3, 2003); <u>see also</u> <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985) (Absent unusual circumstances, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, unless proof of the incidents includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. . . .").

### 3.    <u>Categories One and Two</u>

Finally, Plaintiff fails to establish her <u>Monell</u> claim on the basis of categories one and two.  As discussed above, these two purported "policies" do not allege affirmative customs or rules, but rather failures to act.  Accordingly, they fall within the third group of actionable municipal "policies," where "the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." <u>Natale</u>, 318 F.3d at 584.  Such failures to act, however, "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." <u>Berg v. County of Allegheny</u>, 219 F.3d 261, 276 (3d Cir. 2000).

As noted in detail above, the Court finds nothing in any action by Defendant Omlor, Defendant Micun, or Defendant County of Delaware to constitute deliberate indifference. Nor has there been any pattern of violations that should have alerted Defendant County of Delaware of its need to establish such policies.  Accordingly, summary judgment on such claims is warranted.

In a last ditch effort to resuscitate her case, Plaintiff offers two bases for a finding of deliberate indifference on the part of Defendant Delaware County, neither of which this Court finds convincing.  First, Plaintiff argues that a medical screening policy is in place in neighboring Montgomery County, thereby putting Delaware County on notice to enact a similar policy. Joseph Lutz, the director of the Montgomery County ARD program, testified that he takes certain precautions with his community service workers by having all applicants fill out medical forms indicating their medical conditions and by considering weather conditions and a claimant's age

41

when handing out work assignments.  (Pl.'s Opp. Summ. J., Ex. F, Joseph Lutz Dep. ("Lutz Dep."), 11:23-12:22, 14:10-16:16, Nov. 17, 2008.)

The Court finds this argument unavailing.  The mere fact that another county operates under these procedures neither makes such procedures a constitutional requirement nor establishes Defendants' deliberate indifference in failing to implement such policies.[21]

Alternatively, Plaintiff again hangs her hat on the case of Lawrence Malar, who reported for community service under Delaware County's ARD program approximately five months prior to Marvel's death.  See infra n.3.  Although Mr. Malar produced a doctor's note advising that his community service needed to be limited to non-strenuous activities due to multiple medical conditions, he was allegedly required to work manual labor in extreme weather conditions and wound up hospitalized for five days with pneumonia.  (PSUF ¶ 7.)  Plaintiff contends that Mr. Malar's incident put Defendant Delaware County on notice of its need to screen applicants and be wary of extreme weather conditions, thereby demonstrating Defendant's deliberate indifference in failing to so act.

As discussed above, however, Mr. Malar unequivocally testified that prior to reading an article about Marvel's death in the newspaper, he had never spoken to anyone in the community service department of Delaware County and had never made any complaints.  (Defs.' Mot. Summ. J., Ex. 15, Lawrence Malar Dep. ("Malar Dep."), 64:2-66:21, Oct. 15, 2008.) Accordingly, the Court cannot find that an incident, which was not brought to the attention of

---

21.   To take this argument to its limit, a plaintiff could argue that one county's decision, for example, to provide transportation to and from the work site for all community service workers in order to avoid traffic accidents along the way, would constitutionally mandate that all neighboring counties adopt the same procedures.

Defendants until after Marvel's death, put Delaware County on notice, prior to Marvel's death, to enact certain policies.

Finally, even assuming the Court could find deliberate indifference in the County's failures to act, Plaintiff again neglects to establish the requisite causation. As noted above, the evidence is clear that Marvel's death was not heat-related. Thus, the failure to cancel community service work in extreme weather conditions has no direct causal link to the deprivation of constitutional rights. Moreover, again as discussed above, Plaintiff has repeatedly emphasized that Marvel had no knowledge of any cardiac disease, let alone the extreme blockages in his two arteries. As such, even had Defendants questioned him as to his medical conditions, he would not have informed them about any cardiac concerns.

In sum, the Court finds no genuine issue of fact precluding the issuance of summary judgment on the municipal liability claim. Plaintiff not only fails to establish a policy or custom by Defendants, but she has failed to prove any causation between Defendants' actions or inactions and Marvel's death. Therefore, this claim is dismissed.

## V.  CONCLUSION

In light of the foregoing, the Court remains legally bound to dismiss this entire case on summary judgment. Although the Court originally declined to grant Defendants' Motion to Dismiss, the same facts upon which the Court relied in the motion to dismiss stage have been unequivocally disproved at the summary judgment stage. While Plaintiff has certainly produced an abundant quantity of papers in opposition to the Defendants' motion, the quality and substance of that evidence is simply insufficient for a jury to return a verdict in her favor. The current evidence reveals that Mr. Marvel, while suffering an unspeakable tragedy, was not the

victim of any state created danger or other constitutional violation by the Defendants.

Accordingly, the Court grants summary judgment in favor of all Defendants and against Plaintiff

on the entirety of the case.